[No. B036700. Second Dist., Div. Two. Aug. 1, 1989.]

THE PEOPLE, Plaintiff and Appellant, v.
CESAR FERNANDEZ, Defendant and Respondent.

COUNSEL

Ira Reiner, District Attorney, Harry B. Sondheim and George G. Size, Deputy District Attorneys, for Plaintiff and Appellant.

Jerry Kaplan and Kaplan, Kenegos & Kadin for Defendant and Respondent.

## OPINION

**ROTH, P. J.**—The People appeal from the trial court's order quashing the search warrant for Cesar Fernandez's apartment, suppressing resulting evidence and dismissing the case against him on the basis of an insufficient warrant. (Pen. Code, § 1538.5.) We reverse.

The order is appealable. (Pen Code, § 1238, subd. (a)(7).)

■ On review, we apply the same standard which governed the trial court: the magistrate's order issuing the warrant may be set aside only if the affidavit, as a matter of law, does not establish probable cause. (*People* v. *Campa* (1984) 36 Cal.3d 870, 878 [206 Cal.Rptr. 114, 686 P.2d 634].) A reviewing court should give great deference to the magistrate's determination of probable cause. (*People* v. *Love* (1985) 168 Cal.App.3d 104, 109 [214 Cal.Rptr. 483].) The question is simply whether the magistrate had a substantial basis for concluding that probable cause to search the described premises existed. (*Illinois* v. *Gates* (1983) 462 U.S. 213, 236 [76 L.Ed.2d 527, 546-547, 103 S.Ct. 2317].)

■ Probable cause to search exists when, based on the totality of circumstances described in the affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois* v. *Gates, supra,* 462 U.S. at p. 238 [76 L.Ed.2d at p. 548].)

The essence of respondent's argument is that the affidavit does not explain the relevance of respondent's apartment, i.e., does not link the apartment with drug trafficking. We disagree.

Glendale Police Officer Ian Grimes supplied the affidavit in support of the search warrant. He stated that he was assigned to the narcotics bureau, and had been trained in investigating drug-related offenses. He had participated in more than 250 surveillances of drug traffickers. Based on his training and experience, he knew that drug traffickers often engage in the following activities: the frequent use of public telephones to avoid wire taps; the use of beepers and cellular telephones to keep in touch with coconspirators; the use of antisurveillance driving techniques; the use of postal drop box addresses to register vehicles; and the use of several rental properties in a given area.

A multiagency investigation of cocaine distribution had focused suspicion on a certain Edward Cardona. Several cars were registered to him at a postal drop box in West Los Angeles. It was believed that Cardona was living at 357 South Rexford Street, Beverly Hills. Surveillance of the location began on September 16, 1987.

A jeep registered to Cardona was parked in the building's parking lot. That afternoon a man matching Cardona's description and a woman passenger drove the jeep to a bank. The woman entered the bank and engaged in a transaction with about $3,000 in $100 bills. Meanwhile Cardona drove around the block while talking on a cellular phone. He picked up the woman and drove to a restaurant. He wrote in a notebook while they ate. The woman went to a public telephone and told the party on the other end that she needed "the whole package today." They returned to 357 South Rexford.

A bit later the two drove to 220 South Rexford Street. The woman spoke to the occupant of apartment A while Cardona stood back and observed passing traffic. After staying at the apartment about 15 minutes the couple returned to the jeep and drove away. They drove very swiftly and drove through several traffic lights just as they turned red, as though attempting to evade surveillance.

An hour and a half after they returned to 357 South Rexford. Cardona walked a half block to 332 South Rexford, Apartment 1, where respondent lived. He knocked on the door, but no one answered. He slipped two envelopes under the door, and returned to 357 South Rexford Street.

Approximately an hour later Cardona drove to a market while talking on a cellular phone. He got out of the car, consulted his pager and went to a public phone. He said: "Your car is at the airport, you leave the ticket in the car." Officer Grimes noted in his affidavit that drug traffickers often use cars parked by one individual and picked up by another to distribute drugs. Cardona returned to 357 South Rexford.

About 45 minutes later Cardona walked to respondent's residence, where he met a man who had parked a silver Audi in front of the building. They had a brief conversation while they observed passing traffic.

About 15 minutes later, Julio Osorio parked a blue Mercury in front of respondent's apartment. Osorio walked to respondent's open door, carrying a briefcase. After conversing with three individuals in the apartment, Osorio left with his briefcase.

Osorio drove to a newsstand. A man got into the car. While Osorio spoke on a cellular phone, he slowly drove around a six-block area for fifteen minutes, almost continuously looking into the rear view mirror. This is a driving pattern typical of drug dealers. Osorio drove back to the newsstand and let out his passenger, who entered a Honda Prelude. This Honda was registered to the same postal drop box as Cardona's jeep.

Surveillance resumed the next day. Osorio met with Gilbert Tabares at 3445 Mentone Avenue in Palms. Officer Grimes later ran a check on Tabares and learned that he had been arrested a number of times for drug-related crimes. After going into one of the condominiums they left the complex together in a white Mercury Lynx. Osorio was carrying a cellular phone and Tabares was carrying a briefcase. Tabares began driving in a circle while Osorio spoke on the phone and examined the contents of the briefcase. They returned to the Palms area, where they met a black South American. The three drove to Tabares's condominium. About five minutes later Osorio drove away in the blue Mercury. Tabares drove the Mercury Lynx onto the Santa Monica Freeway, then suddenly swerved onto the next off ramp. Once back on the streets he made dangerous lane changes and turns, frustrating attempts to follow him.

On September 21 Osorio drove to Tabares's condominium complex. He met Tabares in the Mercury Lynx. Tabares was agitated and yelled at Osorio. Tabares got a black briefcase from his car and opened it for Osorio to inspect. They drove away in their respective cars.

At 3 p.m. Osorio drove the Mercury to 1616 South Wooster in Los Angeles. He entered the house with a black briefcase. He left an hour later and drove to the newsstand, where he met three Latino men who were driving a tan Oldsmobile. They spoke for approximately 10 minutes. One of the three men entered Osorio's Mercury and drove it back to 1616 South Wooster. Osorio and the other two got into the Oldsmobile and drove to a bar on Wilshire Boulevard, then to a market where they used a public phone for about fifteen minutes. They then drove away, using antisurveillance techniques.

Meanwhile, Cardona drove his jeep to 1616 South Wooster. Forty minutes later he left, returning just a minute later, talking on a cellular phone. The male Latinos who had driven Osorio's Mercury exited the house with the tan briefcase and got back into the Mercury. The Mercury began following the jeep, both drivers talking on the cellular phones. Using antisurveillance driving techniques both cars were lost from view.

On September 22 Cardona left 357 South Rexford in his jeep. He threw some torn papers from the jeep which the police were able to recover. The

police considered that the papers constituted a ledger with coded words and figures representing quantities of cocaine.

Based on the foregoing showing, the magistrate issued a search warrant for, among other places, 332 South Rexford Street, Apartment 1, where respondent resided. The search uncovered 933.9 grams of cocaine, 457 grams of marijuana, an electronic scale, and narcotics ledger.

In quashing the search warrant, the court below stated: "[T]here's no identification of Fernandez in the affidavit. There's no information. There's no investigation or explanation of any efforts to determine the occupancy or even ownership of the apartment at 332 South Roxbury [*sic*]. There's no opinion expressed by the officer concerning whether Fernandez was in fact engaged in narcotics activity, and there's no explanation of the officer's opinion concerning the meaning of any of his conduct. . . . Obviously, it appears to the court that there is insufficient evidence in the warrant to provide probable cause to believe that Mr. Fernandez was engaged in criminal activity or that criminal activity was being conducted at that location." While this is a substantially correct view of the affidavit, it is rather beside the point, and appears to confuse the standard of probable cause to *search* with probable cause to *arrest*. ■ "[V]alid warrants may be issued to search *any* property, whether or not occupied by a third party, at which there is probable cause to believe that fruits, instrumentalities, or evidence of a crime will be found. . . . Search warrants are not directed at persons; they authorize the search of 'place[s]' and the seizure of 'things,' and as a constitutional matter they need not even name the person from whom the things will be seized." (*Zurcher* v. *Stanford Daily* (1978) 436 U.S. 547, 554-555 [56 L.Ed.2d 525, 534-535, 98 S.Ct. 1970]; accord, *People* v. *Frank* (1985) 38 Cal.3d 711, 728-729 [214 Cal.Rptr. 801, 700 P.2d 415].)

This principle is dispositive of the case at bench. The affidavit's detailed descriptions of the activities of a number of people over a period of several days, would plainly lead a reasonable person to suspect that these individuals were engaged in narcotics trafficking. Their frequenting respondent's apartment, and particularly Cardona's slipping two envelopes into the apartment, supported the supposition that evidence of illegal activity might be found within. The extent of respondent's personal involvement in that activity was not in issue. Thus, the fact that respondent's apartment had a supporting, rather than starring role in the affidavit is not significant; respondent's failure to make even a cameo appearance does not invalidate the warrant.

Even were we to consider the affidavit too meager to provide probable cause to search respondent's apartment, the search was valid under the

doctrine of *United States* v. *Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405]. ▆ *Leon* held that evidence may not be suppressed if the officer executing the warrant was acting in an objectively good faith belief in the validity of the warrant. (*Id.* at p. 926 [82 L.Ed.2d at pp. 700-701].) Reliance upon the warrant would be objectively unreasonable only if the affidavit was so lacking in probable cause indicia as to render official belief in its existence entirely unreasonable. (*Id.* at p. 923 [82 L.Ed.2d at pp. 698-699].)

The rule of *Leon* amounts to this: having been told by a neutral magistrate to perform a search, the officer who in good faith obeys the apparently lawful order may not be "punished" by application of the exclusionary rule, if later the warrant falls from favor.

As we have noted, the affidavit prepared by Officer Grime was not lacking in indicia of probable cause. There is no suggestion that any statement in the affidavit was false or misleading, or that the magistrate abandoned his duty of judicial impartiality. (468 U. S. at p. 923. [82 L.Ed.2d at pp. 698-699].) The executing officers were therefore justified in relying on the authority of the search warrant.

The judgment (order suppressing evidence and dismissing the case) is reversed and remanded for further proceedings.

Compton, J., and Gates, J., concurred.