## STATE OF CONNECTICUT *v.* MICHAEL JOSEPH MARSALA
## (13830)

PETERS, C. J., SHEA, CALLAHAN, GLASS, COVELLO, HULL and
SANTANIELLO, Js.

Argued May 1—decision released August 7, 1990

*Richard Emanuel,* assistant public defender, with whom was *G. Douglas Nash,* public defender, for the appellant (defendant).

*Carolyn K. Longstreth,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney for the appellee (state).

SHEA, J. The dispositive issue in this appeal is whether evidence seized by police officers in violation of our state constitution may be admitted during a criminal trial, as part of the state's case-in-chief, under a "good faith" exception to the exclusionary rule. The question comes to us upon certification from a decision rendered by the Appellate Court; *State* v. *Marsala,* 19 Conn. App. 478, 563 A.2d 730 (1989); affirming the conviction of the defendant, Michael Joseph Marsala, for two violations of the state dependency producing drug law, General Statutes § 21a-278 (b).[1] We conclude that a "good faith" exception to the exclusionary rule is incompatible with the constitution of Connecticut, article first, § 7,[2] and, therefore, that the decision of the Appellate Court, applying such an exception, must be reversed.

---

[1] General Statutes § 21a-278 (b) provides in part: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marihuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years."

[2] The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from

The facts underlying the defendant's conviction are set forth in an opinion rendered by the Appellate Court after the defendant had appealed from that judgment. *State* v. *Marsala,* 15 Conn. App. 519, 520–22, 545 A.2d 1151, cert. denied, 209 Conn. 816, 550 A.2d 1087 (1988) (*Marsala I*). Incriminating evidence was seized from both the defendant's person and his home, pursuant to a search warrant issued for the purpose of allowing police officers to search those two places. More pertinent to our decision today, however, are the legal conclusions reached by both the trial and Appellate courts on the basis of the facts set forth in *Marsala I.* After a hearing conducted for the purpose of ruling on the defendant's motion to suppress the evidence seized, the trial court granted the motion as to the evidence taken from the defendant's home but denied the motion as to the evidence obtained from his person.

The trial court concluded that the affidavit, submitted in support of the search warrant application, contained no information from which the issuing judge could have determined the basis of knowledge of two informants whose observations had been relied on by the affiants. Further, the trial court concluded that information contained in the affidavit detailing a surveillance of the defendant conducted by police officers did nothing to corroborate, in regard to a search of the defendant's home, the informants' descriptions of the defendant's activities. *Marsala I,* supra, 522; see *State* v. *Kimbro,* 197 Conn. 219, 235–36, 496 A.2d 498 (1985).[3] The trial court denied, however, the motion to

unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[3] *State* v. *Kimbro,* 197 Conn. 219, 235–36, 496 A.2d 498 (1985), held that the determination of "probable cause" under article first, § 7, of the Connecticut constitution is to be determined, when informants are relied upon, on the basis of the "veracity" or "reliability" and the "basis of knowledge" tests set forth in *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584,

suppress the evidence seized from the defendant's person, reasoning that observations of the defendant's activities, made by one of the affiants, had corroborated the details provided by the informants and that the combined information, therefore, constituted probable cause to arrest the defendant. *Marsala I,* supra.

Before the Appellate Court, the state conceded that the "warrant executed upon the person and residence of the defendant was fatally defective in that the underlying affidavit lacked the requisite indicia of reliability and basis of knowledge" of the two informants. Id., 523. The state argued, however, that the admission of the items seized from the defendant's person could be justified under the investigative stop doctrine as set forth in *Terry* v. *Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).The Appellate Court rejected this contention; *Marsala I,* supra, 523–24; but relying upon its prior decision in *State* v. *Brown,* 14 Conn. App. 605, 543 A.2d 750, cert. denied, 208 Conn. 816, 546 A.2d 283 (1988), remanded the case to the trial court so that it could resolve certain factual matters and determine whether the admission of the seized items could be justified under the good faith exception to the exclusionary rule established by the United States Supreme Court in *United States* v. *Leon,* 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), and *Massachusetts* v. *Sheppard,* 468 U.S. 981, 104 S. Ct. 3424, 82 L. Ed. 2d 737 (1984). *Marsala I,* supra, 526.

On remand, the trial court issued a written decision in compliance with the directive of the Appellate Court

21 L. Ed. 2d 637 (1969), and *Aguilar* v. *Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), rather than the "totality of the circumstances" test adopted in *Illinois* v. *Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983). Because the certified question is limited to the existence in this state of the good faith exception to the exclusionary rule, we have no occasion to reconsider our holding in *State* v. *Kimbro,* supra.

to make four specific determinations. The trial court concluded: (1) "the affiants did not mislead the issuing judge"; see *Franks* v. *Delaware,* 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978); (2) there was "no evidence that the issuing judge wholly abandoned his judicial role"; see *Lo-Ji Sales, Inc.* v. *New York,* 442 U.S. 319, 99 S. Ct. 2319, 60 L. Ed. 2d 920 (1979); (3) "the police officers did have a reasonable belief that the warrant was valid"; see *Brown* v. *Illinois,* 422 U.S. 590, 610–11, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (Powell, J., concurring); and (4) "the warrant was not so facially deficient in its lack of particularity, regarding the place to be searched or the articles to be seized, that the executing officers could not reasonably presume it to be valid." See *United States* v. *Leon,* supra, 923. In his appeal from this decision, the defendant did not contest the trial court's first, second or fourth conclusions. *State* v. *Marsala,* 19 Conn. App. 478, 480, 563 A.2d 730 (1989) (*Marsala II*). Thus, the issue before the Appellate Court was "whether the trial court erred in concluding on remand that the officers executing the warrant acted in objectively determinable good faith and that, therefore, the 'good faith' exception to the exclusionary rule applied." Id. The Appellate Court concluded, upon its own independent review of the record and transcripts, that the trial court had not erred and that the evidence seized from the defendant's person was properly admitted at his trial. Id., 483.

We granted the defendant's petition for certification; see Practice Book § 4126 et seq.; limited to the following issue: "Does a good faith exception to the exclusionary rule exist under Connecticut law; and if so, did the Appellate Court err in concluding that the good faith exception was applicable in this case?" *State* v. *Marsala,* 213 Conn. 805, 567 A.2d 836 (1989). We answer the first portion of this question in the negative and, therefore, need not consider the second portion.

I

The defendant claims that apart from any constitutional considerations, General Statutes § 54-33f[4] mandates the exclusion of illegally seized evidence and that the statute's operation is unimpeded by any good faith exception. See Practice Book § 822.[5] The defendant relies principally on: (1) § 54-33f (c), which provides that if a suppression motion is granted, "the property shall

[4] "[General Statutes] Sec. 54-33f. MOTION FOR RETURN OF UNLAWFULLY SEIZED PROPERTY AND SUPPRESSION AS EVIDENCE. (a) A person aggrieved by search and seizure may move the court which has jurisdiction of his case or, if such jurisdiction has not yet been invoked, then the court which issued the warrant, or the court in which his case is pending, for the return of the property and to suppress for use as evidence anything so obtained on the ground that: (1) The property was seized without a warrant, or (2) that warrant is insufficient on its face, or (3) the property seized is not that described in the warrant, or (4) there was not probable cause for believing the existence of the grounds on which the warrant was issued, or (5) the warrant was illegally executed. In no case may the judge who signed the warrant preside at the hearing on the motion.

"(b) The motion shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing.

"(c) The court shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted, the property shall be restored unless otherwise subject to lawful detention and it shall not be admissible in evidence at any hearing or trial."

[5] "[Practice Book] Sec. 822.——RETURN OF SEIZED PROPERTY

"A person aggrieved by a search and seizure may make a motion to the judicial authority who has jurisdiction of his case, or if such jurisdiction has not yet been invoked, then to the judicial authority who issued the warrant or to the court in which his case is pending, for the return of specific items of property and to suppress their use as evidence on the grounds that:

"(1) The property was illegally seized without a warrant under circumstances requiring a warrant.

"(2) The warrant is insufficient on its face;

"(3) The property seized is not that described in the warrant;

"(4) There was not probable cause for believing the existence of the grounds on which the warrant was issued; or

"(5) The warrant was illegally executed."

be restored unless otherwise subject to lawful deten-
tion and *it shall not be admissible in evidence at any
hearing or trial"* (emphasis added); (2) Practice Book
§ 821, which provides that, upon motion of the defend-
ant, "the judicial authority shall suppress potential tes-
timony or other evidence if he finds that suppression
is required under the constitution or laws of the United
States or the state of Connecticut"; and (3) the fact
that there have been two unsuccessful legislative
attempts to amend § 54-33f, so as to include a good faith
exception to the exclusionary rule. See 1983 House Bill
No. 5125;[6] 1985 House Bill No. 7011.

The defendant's reliance upon Practice Book § 821
is without merit. That provision establishes no substan-
tive standard for the suppression of illegally seized evi-
dence, but, rather, depends upon the applicable inter-
pretation of either the United States or Connecticut
constitution to determine whether evidence should be
suppressed. If the provisions of either constitution, as
currently interpreted, require the suppression of any
evidence seized, § 821 merely directs the judicial
authority to carry forth that suppression. In that
regard, it is the constitution either of the United States
or the state of Connecticut that requires the suppres-
sion, not § 821. Accordingly, § 821 incorporates the
existing standards of search and seizure jurisprudence,
as set forth by this court, our Appellate Court and the
United States Supreme Court, leaving to trial courts
the task of determining whether suppression is required
in a particular case. See *State* v. *Brown,* supra, 625–26.

---

[6] House Bill No. 5125 (1983) would have amended General Statutes
§ 54-33f to include the following: "When otherwise admissible in a crimi-
nal trial, evidence obtained in violation of any statute, rule or constitutional
provision shall not be suppressed if the judicial authority determines that
the officers obtaining the evidence held a good faith and reasonable belief
that they were acting legally."

Regarding the defendant's claim that § 54-33f and the virtually identical provisions of § 822 preclude the adoption of a good faith exception to the exclusionary rule, we agree with the Appellate Court's resolution of this issue in *State* v. *Brown,* supra, 623–26, holding that the statute and Practice Book provisions are procedural rather than substantive and, therefore, do not define the extent of the exclusionary rule under Connecticut law. We have previously noted that § 54-33f was enacted in response to the United States Supreme Court's decision in *Mapp* v. *Ohio,* 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961),[7] and that prior to that decision there was "no [express] provision in our practice for a motion to suppress." *State* v. *Mariano,* 152 Conn. 85, 89, 203 A.2d 305 (1964), cert. denied, 380 U.S. 943, 85 S. Ct. 1025, 13 L. Ed. 2d 962 (1965).

Section 54-33f provides expressly that evidence may be suppressed on the ground that "[t]he property was seized without a warrant," and that if the motion is granted, "the property . . . shall not be admissible in evidence at any hearing or trial." If we were to accept the defendant's contention that § 54-33f provides substantive rights rather than a procedure for implementing motions to suppress evidence, numerous decisions of this court, upholding the introduction of evidence seized without a warrant, simply could not be justified, since the introduction would have been in direct violation of the statutory provision. See, e.g., *State* v. *Magnano,* 204 Conn. 259, 271, 528 A.2d 760 (1987) (exigent circumstances); *State* v. *Gasparro,* 194 Conn. 96, 107, 480 A.2d 509 (1984), cert. denied, 474 U.S. 828, 106 S. Ct. 90, 88 L. Ed. 2d 74 (1985) (inventory searches); *State* v. *Graham,* 186 Conn. 437, 443–45, 441 A.2d 857 (1982) (plain view doctrine); *State* v. *Shaw,* 186 Conn. 45, 48–49, 438 A.2d 872 (1982)

---

[7] See Conn. Joint Standing Committee Hearings, Judiciary and Governmental Functions, Pt. 3, 1963 Sess., p. 875.

(search incident to a lawful custodial arrest); *State* v. *Januszewski,* 182 Conn. 142, 155–57, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981) (automobile exception to warrant requirement).

The defendant also argues that the legislature's failure to adopt two proposed amendments to § 54-33f, which would have included a good faith exception to the exclusionary rule, "are powerful signals that (1) our legislators did not believe that we already had a statutory good faith exception, (2) nor were they convinced that we should adopt one." We conclude that the legislature's failure to adopt these proposed amendments, although possibly indicative of both of the "signals" advanced by the defendant, cannot transform a procedural statute or Practice Book provision into one that provides criminal defendants with substantive rights. In cases in which this court has considered the legal effect of failed attempts to amend existing law, we have viewed those failures as indicative of legislative approval of an existing interpretation of substantive law. "The legislature is presumed to be aware of the interpretation placed upon its legislation by the courts and the effect which its own nonaction thereafter may have." *Buxton* v. *Ullman,* 147 Conn. 48, 56, 156 A.2d 508 (1959), appeal dismissed, 367 U.S. 497, 81 S. Ct. 1752, 6 L. Ed. 2d 989 (1961); *McDonald* v. *Haynes Medical Laboratory, Inc.,* 192 Conn. 327, 334 n.13, 471 A.2d 646 (1984); *Herald Publishing Co.* v. *Bill,* 142 Conn. 53, 63, 111 A.2d 4 (1955); see generally 2A J. Sutherland, Statutory Construction (1984) § 48.18; D. O'Connor, "The Use of Connecticut Legislative History in Statutory Construction," 58 Conn. B.J. 422, 437–39 (1984). We discern, however, little or no inferential value in the failed amendments in this case, since § 54-33f has never been interpreted by this court as providing anything more than a procedural mechanism

for the bringing of motions to suppress evidence. Thus, even if both of the defendant's assumptions regarding "signals" from the legislature concerning a good faith exception to the exclusionary rule are correct, those "signals" are simply inapplicable when they concern substantive rights and the existing law is one of procedure.

## II

The defendant's principal claim, which we find persuasive, is that a good faith exception to the exclusionary rule is incompatible with article first, § 7, of our state constitution, which provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation." This language has remained unchanged since it was first adopted as article first, § 8, of our 1818 constitution,[8] and is quite similar to the protections afforded by the fourth amendment to the United States constitution.[9]

We have frequently relied upon decisions of the United States Supreme Court interpreting the fourth

---

[8] Article first, § 8, of the 1818 constitution of Connecticut became article first, § 7, on December 30, 1965, the date on which then Governor John Dempsey proclaimed the adoption of our present state constitution.

[9] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." This provision was made applicable to the states, by virtue of the due process clause of the fourteenth amendment to the United States constitution, in *Wolf* v. *Colorado,* 338 U.S. 25, 28, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949). The *Wolf* court's decision not to apply to the states the federal exclusionary rule, adopted in *Weeks* v. *United States,* 232 U.S. 383, 398, 34 S. Ct. 341, 58 L. Ed. 652 (1914), was overruled in *Mapp* v. *Ohio,* 367 U.S. 643, 655–56, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

amendment, as well as other amendments to the United States constitution, to define the contours of the protections provided in the various sections of the declaration of rights contained in our state constitution. We have also, however, determined in some instances that the protections afforded to the citizens of this state by our own constitution go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. *State* v. *Dukes,* 209 Conn. 98, 112, 547 A.2d 10 (1988); *State* v. *Stoddard,* 206 Conn. 157, 166, 537 A.2d 446 (1988); *State* v. *Kimbro,* 197 Conn. 219, 235–36, 496 A.2d 498 (1985). In so doing, we have recognized that "[i]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut residents have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law." *Horton* v. *Meskill,* 172 Conn. 615, 641–42, 376 A.2d 359 (1977).

In this case, we are called upon to determine whether the United States Supreme Court's decision in *United States* v. *Leon,* supra, as adopted by the Appellate Court in *State* v. *Brown,* supra, and applied by that court in this case, upon "respectful consideration," is to become the law of this state. In *Leon,* after "accepting the Court of Appeals' conclusion that probable cause [for issuance of a search warrant] was lacking under the

prevailing legal standards"; *United States* v. *Leon,* supra, 905; the United States Supreme Court held, nevertheless, "that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." Id., 922.

In arriving at this conclusion, the court began its analysis by noting that: (1) the fourth amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands"; id., 906; (2) "the use of fruits of a past unlawful search or seizure 'work[s] no new Fourth Amendment wrong' "; id., quoting *United States* v. *Calandra,* 414 U.S. 338, 354, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974); (3) "[t]he wrong condemned by the Amendment is 'fully accomplished' by the unlawful search or seizure itself"; *United States* v. *Leon,* supra, quoting *United States* v. *Calandra,* supra; and (4) "the exclusionary rule is neither intended nor able to 'cure the invasion of the defendant's rights which he has already suffered.' " *United States* v. *Leon,* supra, quoting *Stone* v. *Powell,* 428 U.S. 465, 540, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976) (White, J., dissenting). On these grounds, the court reiterated that the exclusionary "rule thus operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.' " *United States* v. *Leon,* supra, quoting *United States* v. *Calandra,* supra, 348. Stating that the issue before it was "[w]hether the exclusionary sanction is appropriately imposed in a particular case," and not " 'whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct' "; *United States* v. *Leon,* supra, quoting *Illinois* v. *Gates,* 462 U.S. 213, 223, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); the court concluded that the

question "must be resolved by weighing the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective." *United States* v. *Leon, supra,* 906–907.

According to the court in *Leon,* "[t]he substantial social costs exacted by the exclusionary rule for the vindication of Fourth Amendment rights have long been a source of concern." Id., 907. Thus, according to the *Leon* court, " '[o]ur cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury.' " Id., quoting *United States* v. *Payner,* 447 U.S. 727, 734, 100 S. Ct. 2439, 65 L. Ed. 2d 468 (1980). Despite noting that many researchers "have concluded that the impact of the exclusionary rule is insubstantial"; *United States* v. *Leon, supra,* 908 n.6; the court declared that "[a]n objectionable collateral consequence of this interference with the criminal justice system's truth-finding function is that some guilty defendants may go free or receive reduced sentences as a result of favorable plea bargains." Id., 907. The court justified this observation by noting that the relatively small percentage of cases resulting in nonprosecution or nonconviction because of the exclusionary rule[10] "mask a large absolute number of felons who are

---

[10] The United States Supreme Court cited specific percentages from a study which "suggests that the [exclusionary] rule results in the nonprosecution or nonconviction of between 0.6% and 2.35% of individuals arrested for felonies . . . [while] the cumulative loss due to nonprosecution or nonconviction of individuals arrested on felony drug charges is probably in the range of 2.8% to 7.1%." *United States* v. *Leon,* 468 U.S. 897, 907 n.6, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), citing T. Davies, "A Hard Look at What We Know (and Still Need to Learn) About the 'Costs' of the Exclusionary Rule: The NIJ Study and Other Studies of 'Lost' Arrests," 1983

released because the cases against them were based in part on illegal searches or seizures." Id., 908 n.6.

The *Leon* court's conclusion regarding the costs of the exclusionary rule has been criticized on numerous levels. First, there is the obvious inconsistency between the "substantial" costs of the exclusionary rule, as identified by the court, and the "insubstantial" impact of the rule, as found by the research on which the court relied. As one commentator has stated, "[t]o date, the most careful and balanced assessment of all available empirical data shows 'that the general level of the rule's effects on criminal prosecutions is marginal at most.' "[11] 1 W. LaFave, Search and Seizure § 1.3 (c), p. 52, quoting, T. Davies, "A Hard Look at What We Know (and Still Need to Learn) About the 'Costs' of the Exclusionary Rule: The NIJ Study and Other Studies of 'Lost' Arrests," 1983 Am. B. Found. Research J. 611, 622.

Second, the *Leon* court's assessment of the costs of the exclusionary rule is based on the effect of the rule in all cases instead of on the effect it would have in those cases in which evidence was suppressed despite the objectively reasonable behavior of the police offi-

Am. B. Found. Research J. 611. The same study, according to the *Leon* court, "suggests that [in California,] screening by police and prosecutors results in the release because of illegal searches or seizures of as many as 1.4% of all felony arrestees . . . that 0.9% of felony arrestees are released, because of illegal searches or seizures, at the preliminary hearing or after trial . . . and that roughly 0.05% of all felony arrestees benefit from reversals on appeal because of illegal searches." *United States* v. *Leon,* supra, 907 n.6; see P. Nardulli, "The Societal Cost of the Exclusionary Rule: An Empirical Assessment," 1983 Am. B. Found. Research J. 585, 606–607 (concluding that the exclusionary rule has a "truly marginal" effect on the criminal court system); P. Nardulli, "The Societal Costs of the Exclusionary Rule Revisited," 1987 U. Ill. L. Rev. 223, 238–39 (confirming earlier study and concluding that "the prominence of the role played by the exclusionary rule does not necessarily increase with the size of the jurisdiction studied").

[11] Neither the defendant nor the state has provided us with any empirical data regarding the impact of the exclusionary rule in this state.

cers involved. As Justice Brennan noted, the *Leon* majority "ignores this distinction and mistakenly weighs the aggregated costs of exclusion in *all* cases, irrespective of the circumstance that led to exclusion . . . against the potential benefits associated with only those cases in which evidence is excluded because police reasonably but mistakenly believe that their conduct does not violate the Fourth Amendment . . . . When such faulty scales are used, it is little wonder that the balance tips in favor of restricting the application of the rule." *United States* v. *Leon,* supra, 951 (Brennan, J., dissenting). "This is not an insignificant error, for had the Court's 'cost' inquiry been properly focused it would have been apparent that the relevant costs are insubstantial." 1 W. LaFave, supra, § 1.3 (c), p. 52.

Finally, the *Leon* court "consistently and repeatedly refers to the costs of the exclusionary rule as if they were somehow a matter quite distinct from the Fourth Amendment itself." 1 W. LaFave, supra, § 1.3 (c), p. 53. In this regard, we agree with former Justice Stewart, who has noted that "[m]uch of the criticism leveled at the exclusionary rule is misdirected; it is more properly directed at the fourth amendment itself. . . . The exclusionary rule places no limitations on the actions of the police. The fourth amendment does. The inevitable result of the Constitution's prohibition against unreasonable searches and seizures and its requirement that no warrant shall issue but upon probable cause is that police officers who obey its strictures will catch fewer criminals. That is not a political outcome impressed upon an unwilling citizenry by unbeknighted judges. It is the price the framers anticipated and were willing to pay to ensure the sanctity of the person, the home, and property against unrestrained governmental power." P. Stewart, "The Road to *Mapp* v. *Ohio* and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases," 83 Colum. L. Rev. 1365, 1392–93 (1983).

Although we recognize that the exclusionary rule exacts a certain "cost" from society in the form of the suppression of relevant evidence in criminal trials, we conclude, nevertheless, that this "cost" is not sufficiently "substantial" to overcome the benefits to be gained by our disavowal of the *Leon* court's good faith exception to the exclusionary rule. We base this conclusion on both the criticism leveled against the *Leon* opinion itself and our willingness in other areas of the law to uphold the exclusion of concededly reliable and relevant evidence on the basis of some greater benefit that will be realized by its suppression. Thus, for example, an otherwise voluntary and reliable confession is excluded from a criminal trial on the basis of a violation of *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an exclusionary rule that we have adopted as an interpretation of the due process clause contained in article first, § 8, of the Connecticut constitution. See, e.g., *State* v. *Barrett,* 205 Conn. 437, 447, 534 A.2d 219 (1987); *State* v. *Brown,* 199 Conn. 47, 51 n.3, 505 A.2d 1225 (1986); *State* v. *Ferrell,* 191 Conn. 37, 45 n.12, 463 A.2d 573 (1983). Similarly, numerous categories of reliable and relevant evidence are excluded from both civil and criminal trials on the basis of either a common law or statutorily created privilege against disclosure. See generally C. Tait & J. LaPlante, Connecticut Evidence § 12.5 (Attorney and Client), § 12.6 (Husband and Wife), § 12.7 (Minor and Advisor), § 12.8 (Physician and Patient), § 12.9 (Psychiatrist and Patient), § 12.10 (Psychologist and Patient), § 12.11 (Priest and Penitent), § 12.12 (Journalist and Source), § 12.13 (Identity of an Informer), § 12.14 (Management and Labor), § 12.15 (Deaf or Hearing-Impaired Persons), § 12.16 (Battered or Raped Victim and Counselor), and § 12.17 (Family Relations Officer).

In its own analysis of the "benefits" of the exclusionary rule, the *Leon* court first concluded that operation

of the rule could have no deterrent effect upon the judicial authorities who actually issue search warrants. According to the *Leon* court, "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate." *United States* v. *Leon,* supra, 916; see S. Wasserstrom & W. Mertens, "The Exclusionary Rule on the Scaffold: But Was it a Fair Trial?" 22 Am. Crim. L. Rev. 85, 106 (1984).

Having concluded that the exclusionary rule could have no deterrent effect on those who issue search warrants, the *Leon* court next reasoned that "[i]f exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect . . . it must alter the behavior of individual law enforcement officers or the policies of their departments." *United States* v. *Leon,* supra, 918. Responding to arguments that the exclusionary rule without a good faith exception would deter inadequate presentations by the police in the affidavits submitted in support of search warrant applications and would discourage "magistrate shopping," the *Leon* court found "such arguments speculative and conclude[d] that suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." Id. Virtually foreclosing any exclusion when the police "officer's conduct is objectively reasonable"; id., 919; the court

concluded that "[i]n most such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. . . . Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Id., 920–21.

We simply cannot accept the conclusion reached by the *Leon* court as a result of its weighing of the relevant costs and benefits of excluding evidence obtained through police officers' good faith reliance upon a warrant issued by a detached and neutral judicial official. Initially, we note that the exclusionary rule, although primarily directed at police misconduct, is also appropriately directed at the warrant issuing process, and that "it is somewhat odd to suppose that the exclusionary rule was not designed to deter the issuance of invalid warrants." S. Wasserstrom & W. Mertens, supra, 106. Just as with the fourth amendment, when article first, § 7, of our state constitution was adopted, "its purpose plainly was to prohibit the issuance of warrants that did not satisfy its requirements of probable cause and particularity."[12] Id. The text of article first, § 7, is clear: "[N]o warrant . . . *shall issue* . . . without probable cause supported by oath or affirmation." (Emphasis added.) While we might agree that the exclusionary rule was not designed "to *punish* the errors

---

[12] Historians have consistently concluded that constitutional provisions such as the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution were enacted to ensure that the newly formed federal or state governments "could not employ the two devices used by the British Crown that they believed jeopardized the liberty of every citizen: the general warrant and the writ of assistance." P. Stewart, "The Road to *Mapp* v. *Ohio* and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases," 83 Colum. L. Rev. 1365, 1369 (1983); J. Landynski, Search and Seizure and

of judges and magistrates"; (emphasis added) *United States* v. *Leon,* supra, 916; we cannot agree that the rule as it stood before *Leon* was not a significant factor inducing judges to take seriously their obligation to ensure that the probable cause requirement of article first, § 7, had been met before issuing search warrants based on information contained in affidavits provided to them by police officers. We are confident that, at least in this state, search warrants failing to meet the probable cause requirement more often "result from carelessness than from intentional constitutional violations, and just as surely the exclusionary rule is logically directed to those more common violations." 1 W. LaFave, supra, § 1.3 (d), p. 55. In this sense, the issuing authority, when the determination of probable cause is overturned on appeal, is not being "punished" for a mistake, but is, rather, being informed that a constitutional violation has taken place and is also being instructed in how to avoid such violations in the future. "In other words, the longstanding applicability of the exclusionary rule in with-warrant cases has served not only to deter the occasional ill-spirited magistrate, but more importantly to influence judicial behavior more generally by . . . creating an 'incentive to err on the side of constitutional behavior.' " Id., quoting *United States* v. *Johnson,* 457 U.S. 537, 561, 102 S. Ct. 2579, 73 L. Ed. 2d 202 (1982). Thus, "[t]he more important issue . . . is not the deterrent effect of the exclusionary rule on the conduct of individual magistrates, but the extent to which

the Supreme Court (1966) c. I. Regarding general warrants, see generally *Frisbie* v. *Butler,* 1 Kirby 213, 215 (Super. Ct. 1787), *Grumon* v. *Raymond,* 1 Conn. 39, 42–47 (1814), and 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 387. Regarding the refusal of then Chief Justice Jonathan Trumbull to issue writs of assistance in Connecticut, see O. Dickerson, "Writs of Assistance as a Cause of the Revolution," Studies Inscribed to Evarts Boutell Greene (1939) pp. 52–54, and H. Gray, "Writs of Assistance," J. Quincy, Massachusetts Reports (1865) pp. 501–506.

the rule helps preserve the integrity of the warrant issuing process as a whole." S. Wasserstrom & W. Mertens, supra, 109.

We conclude that a good faith exception to the exclusionary rule would have several negative effects upon this constitutionally mandated warrant issuing process. First, under the good faith exception, "police need concern themselves only with getting a warrant and not with getting a warrant that will hold up on review." Id. Thus, although we are confident that most police officers take very seriously their obligation to present a reviewing authority with a constitutionally adequate basis for the issuance of a warrant, the good faith exception would encourage some police officers to expend less effort in establishing the necessary probable cause to search and more effort in locating a judge who might be less exacting than some others when ruling on whether an affidavit has established the requisite level of probable cause. Second, the "exception for good faith reliance upon a warrant implicitly tells magistrates that they need not take much care in reviewing warrant applications, since their mistakes will from now on have virtually no consequence . . . ." *United States* v. *Leon,* supra, 956 (Brennan, J., dissenting). Finally, despite the *Leon* court's assertion that there "is no need for courts to adopt the inflexible practice of always deciding whether the officers' conduct manifested objective good faith before turning to the question whether the Fourth Amendment has been violated"; id., 924, it is unlikely "that overburdened trial and appellate courts will take the time and effort to write advisory opinions on [search and seizure] law when they can just as easily admit the evidence under the good faith exception." S. Wasserstrom & W. Mertens, supra, 111; *United States* v. *Leon,* supra, 957 n.15 (Brennan, J., dissenting). If we were to adopt the good faith exception, our practice of declining to address

doubtful constitutional issues unless they are essential to the disposition of a case[13] would preclude our consideration of probable cause beyond reviewing whether an officer had an "objectively reasonable" belief in its existence. Absent a meaningful necessity to review probable cause determinations, we conclude that close cases will become "both the hardest to decide and the easiest to dispose of under the good faith exception; in such cases the officer's objective good faith is clearest." S. Wasserstrom & W. Mertens, supra, 112.

We also disagree with the *Leon* court's assertion that "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope"; *United States* v. *Leon,* supra, 920; "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Id., 921. As a threshold observation, we note again that the exclusionary rule is not designed to "punish" anyone. Id., 953 (Brennan, J., dissenting). It is, however, designed to deter future police misconduct and ensure, as nearly as can be, institutional compliance with the warrant issuing requirements of article first, § 7, of our state constitution. The relevant inquiry, therefore, is not whether the officer should be punished for his past behavior, but, rather, whether the sanction of the exclusionary rule is appropriate in cases where the officer in question believed that he was doing everything correctly, but in fact had not supplied the issuing authority with information sufficient to meet the constitutional requirement of probable cause. We conclude that the rule is appropriate in these situations. "[I]t is not as though we cannot expect the police to make

---

[13] See *State* v. *Madera,* 198 Conn. 92, 105, 503 A.2d 136 (1985), aff'd after remand, 210 Conn. 22, 554 A.2d 263 (1989); *Moscone* v. *Manson,* 185 Conn. 124, 134, 440 A.2d 848 (1981) (*Healey, J.,* concurring); *State* v. *DellaCamera,* 166 Conn. 557, 560, 353 A.2d 750 (1974).

accurate assessments of probable cause without the help of a magistrate, for we expect them to make such assessments whenever they search or seize without a warrant, something they do far more often than search or seize with warrant in hand." S. Wasserstrom & W. Mertens, supra, 113–14.

Further, "[i]f the overall educational effect of the exclusionary rule is considered, application of the rule to even those situations in which individual police officers have acted on the basis of a reasonable but mistaken belief that their conduct was authorized can still be expected to have a considerable long-term deterrent effect. If evidence is consistently excluded in these circumstances, police departments will surely be prompted to instruct their officers to devote greater care and attention to providing sufficient information to establish probable cause when applying for a warrant, and to review with some attention the form of the warrant that they have been issued, rather than automatically assuming that whatever document the magistrate has signed will necessarily comport with Fourth Amendment requirements." *United States* v. *Leon,* supra, 955 (Brennan, J., dissenting).

In short, we are simply unable to sanction a practice in which the validity of search warrants might be determined under a standard of "close enough is good enough" instead of under the "probable cause" standard mandated by article first, § 7, of our state constitution. We hold, therefore, that a good faith exception to the exclusionary rule does not exist under Connecticut law.[14]

---

[14] We note that the good faith exception to the exclusionary rule has received mixed reviews in other state courts that have considered its application. It has been rejected on state constitutional grounds; *People* v. *Sundling,* 153 Mich. App. 277, 292, 395 N.W.2d 308 (1986), appeal denied, 428 Mich. 887 (1987); *State* v. *Novembrino,* 105 N.J. 95, 158, 519 A.2d 820 (1987); *People* v. *Bigelow,* 66 N.Y.2d 417, 427, 488 N.E.2d 451, 497 N.Y.S.2d 630

The judgment of the Appellate Court is reversed and the case is remanded to that court for further proceedings consistent with this opinion.

In this opinion the other justices concurred.

(1985); *State* v. *Carter,* 322 N.C. 709, 724, 370 S.E.2d 553 (1988); on statutory grounds; *Commonwealth* v. *Upton,* 394 Mass. 363, 370 n.5, 476 N.E.2d 548 (1985); *Dees* v. *State,* 722 S.W.2d 209, 213–14 (Tex. App. 1986); but see *Lighter* v. *State,* 741 S.W.2d 568, 569 (Tex. App. 1987) (noting statutory change adopting the exception); and on the basis of opinions issued by a higher state court. *State* v. *Grawien,* 123 Wis. 2d 428, 431–32, 367 N.W.2d 816 (Ct. App. 1985); but see *State* v. *Brady,* 130 Wis. 2d 443, 454, 388 N.W.2d 151 (Wis. 1986) (noting that adoption of the exception is still an open question). On the other hand, the good faith exception has been accepted and applied in a number of state court opinions. See *People* v. *Fernandez,* 212 Cal. App. 3d 984, 989–90, 261 Cal. Rptr. 29 (1989); *State* v. *Bernie,* 472 So. 2d 1243, 1248 (Fla. App. 1985), approved, 524 So. 2d 988 (Fla. 1988); *State* v. *Schaffer,* 107 Idaho 812, 821, 693 P.2d 458 (Ct. App. 1984); *People* v. *Stewart,* 104 Ill. 2d 463, 477, 473 N.E.2d 1227 (1984), cert. denied, 471 U.S. 1120, 105 S. Ct. 2368, 86 L. Ed. 2d 267 (1985); *Mers* v. *State,* 482 N.E.2d 778, 783 (Ind. App. 1985); *State* v. *Huber,* 704 P.2d 1004, 1011 (Kan. App. 1985); *State* v. *Shannon,* 472 So. 2d 286, 291 (La. App.), cert. denied, 476 So. 2d 349 (La. 1985); *State* v. *Sweeney,* 701 S.W.2d 420, 426 (Mo. 1985); *State* v. *Wilmoth,* 22 Ohio St. 3d 251, 266–67, 490 N.E.2d 1236 (1986); *Commonwealth* v. *Edmunds,* 373 Pa. Super. 384, 392–93, 541 A.2d 368, appeal granted, 520 Pa. 595, 552 A.2d 250 (1988).