STATE OF CONNECTICUT *v.* ROBERT S. BUIE
(AC 31049)

Lavine, Bear and Dupont, Js.

Argued February 14—officially released July 5, 2011

Neal Cone, senior assistant public defender, for the appellant (defendant).

Bruce R. Lockwood, senior assistant state's attorney, with whom, on the brief, were John A. Connelly, former state's attorney, and John J. Davenport, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. In this appeal, we must determine whether the apparent authority doctrine,[1] which is an exception to the warrant requirement, is constitutional under the constitution of Connecticut. We conclude that the apparent authority doctrine does not offend the right of Connecticut citizens to be free from unreasonable searches, a right guaranteed by article first, § 7.[2]

The defendant, Robert S. Buie, appeals from the judgment of conviction, rendered following a jury trial, of two counts of aiding and abetting aggravated sexual assault in the first degree in violation of General Statutes §§ 53a-8 and 53a-70 (a) (1), and one count each of attempt to commit aggravated sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2)

---

[1] The apparent authority doctrine provides that a warrantless entry by the police is valid when it is based on the consent of a third party who the police, at the time of the entry, reasonably believe to possess common authority over the premises, but, in reality, does not. See *Illinois* v. *Rodriguez*, 497 U.S. 177, 186, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990).

[2] Article first, § 7, of the constitution of Connecticut provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

and 53a-70a (a) (1), conspiracy to commit aggravated sexual assault in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-70a (a) (1), and burglary in the first degree in violation of General Statutes § 53a-101 (a) (1). On appeal, the defendant claims that the court erred in denying his motion to suppress all evidence seized from his apartment because it improperly concluded that the police were permitted to enter his apartment without a search warrant pursuant to the apparent authority doctrine. Specifically, the defendant claims that although the apparent authority doctrine is recognized as an exception to the warrant requirement under federal law, it violates article first, § 7, of the constitution of Connecticut. We do not agree and, accordingly, affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. In September, 2005, LB moved into an apartment adjoining the defendant's apartment in a residential complex (complex).[3] Upon moving into her new apartment, LB first encountered the defendant, and, approximately one month later, LB also met the defendant's girlfriend, Beverly Martin.[4]

On the night of November 18, 2006, LB and a friend visited two bars, and LB arrived home at approximately 1:30 a.m. the following day. LB fell asleep on her living room couch, and, at approximately 4:26 a.m., with her apartment completely dark, she awoke to what she believed was a gun pressed against her head.

The person holding the gun to her head ordered LB to put her hands behind her back. LB recognized the

---

[3] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[4] LB socialized with the defendant and Martin on several occasions after moving to the complex.

voice as that of the defendant. A man later identified as the defendant then forced LB to put her arms behind her back and put a piece of duct tape over her mouth and also bound her hands together with duct tape. With her pants removed, the defendant and Martin then took turns inserting a dildo into LB's vagina and rectum while holding the gun to her head. When they were finished, the defendant inserted his penis into LB's vagina.[5]

After the defendant and Martin left LB's apartment, LB went to a neighbor's apartment and had the neighbor call the police. Officer Joseph Farina arrived at the complex and spoke to LB. LB told Farina that the defendant and Martin had raped her. After an ambulance transported LB to the hospital, Farina and several officers began searching for the defendant and Martin. Farina found the defendant sitting in front of the complex, speaking with two officers.

Sergeant Michael Slavin arrived at the complex at approximately 7 a.m. Slavin learned that the defendant and Martin were willing to go to the detective bureau for further questioning about the incident involving LB. Prior to departing the complex, Martin stated that she wanted to retrieve some items from "her room." Without prompting, Martin stated to Slavin, "I suppose you guys want to come with me . . . ." Slavin agreed, and Detective Richard Baxter and another detective accompanied Martin into the apartment. While in the apartment, Baxter observed something that he believed was connected to the sexual assault. When he exited the apartment, he told Slavin about what he had seen in the defendant's apartment.[6] Officers secured the apartment,

---

[5] LB identified this second person as Martin because she recognized Martin's voice when Martin told LB "to shut up, take it like the slut [you] know [you] are."

[6] The defendant states in his brief that the police saw a black dildo in plain view upon entering the apartment. We have been unable to locate any evidence presented at trial, however, that indicates what prompted Baxter to speak to Slavin after he exited the apartment.

and the defendant and Martin were transported to the detective bureau.[7] Later, after the police obtained a search warrant for the defendant's apartment, they recovered, among other things, a flesh-colored dildo, a black dildo, two BB guns, a container of BBs and a roll of duct tape.

When LB arrived at the hospital, she met with Christina Strachan, an emergency room nurse. Strachan examined LB and noticed a lump on the back of her head, which was consistent with blunt trauma. Strachan also observed red marks on the back of LB's neck and her left shoulder and marks on both knees, consistent with a rug rash. Finally, Strachan observed that the bottom wall of LB's vagina was very tender, which Strachan stated occurs when the vagina is penetrated and the woman is not aroused. After her medical examinations were complete, an officer drove LB to the police station where she identified the defendant and Martin in a photographic array as her attackers.

On January 16, 2007, the police arrested the defendant in New York City, with the assistance of the United States Marshals Service's violent fugitive task force, and one day later, Martin surrendered at the Waterbury police station. The defendant was charged with two counts of aiding and abetting aggravated sexual assault in the first degree and one count each of attempted aggravated sexual assault in the first degree, conspiracy to commit aggravated sexual assault in the first degree and burglary in the first degree.

On March 4, 2008, the defendant filed a motion to suppress all evidence seized from his apartment. Specifically, the defendant claimed that because Martin did not live with him in his apartment, the "police were without authority to enter into the apartment without

---

[7] The defendant and Martin were at the bureau for approximately one hour and left without being placed under arrest.

[his] consent in the course of conducting [their] investigation," and, therefore, they violated his state and federal constitutional rights. On October 27, 2008, the court held a hearing on the defendant's motion. The defendant testified that Martin only had access to his apartment when he also was present in the apartment, that Martin's name was not on the lease and that only he and his former wife had keys to the apartment. He also claimed that he and Martin were not in a romantic relationship and were nothing more than friends. Finally, the defendant argued that because he was present at the scene, the police were obligated to obtain his permission before entering the apartment.

Slavin also testified at the hearing and stated that on November 19, 2006, the police did not know who held the lease for the defendant's apartment. He claimed, however, that "I feel that [Martin] said she was living there. She obviously had personal belongings there. We felt she established residency there. Therefore . . . she was able to give consent for the officers to go in with her." When asked whether the defendant told him that Martin lived in the apartment, Slavin responded that "Ms. Martin told us she lived there."

On October 29, 2008, the court denied the defendant's motion to suppress in an oral decision. Before issuing its decision, the court made several findings of fact. The court first concluded that Slavin was in charge of the police investigation of the sexual assault and that when he arrived at the complex, he met with the defendant and Martin, who were not under arrest at the time. The court then concluded that Martin had indicated that before she was willing to go to the police station, she needed to obtain some personal belongings that were in the apartment, specifically, keys and a cellular telephone. She stated to the officers, "I suppose you

guys want to come in with me."[8] The court found that the police agreed to follow Martin because "the police at the time knew details of the alleged sexual assault, and they knew that a handgun had been involved in the sexual assault and they were concerned for officer safety because they had reason to believe that the handgun might be in the apartment . . . that . . . Martin was entering to retrieve her belongings. That the police did not go into the apartment with any intent to search the apartment for evidence or any intent to seize any items. Their intent was solely to accompany . . . Martin for officer safety."[9]

After making these factual findings, the court, citing *Illinois* v. *Rodriguez*, 497 U.S. 177, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990), stated that "a warrantless search is valid when it is based on the consent of a third party whom the police, at the time of the search, reasonably believe possesses common authority over the premises but who in fact does not have such authority." The court concluded that Martin voluntarily provided the police with permission to enter the apartment and that it was reasonable for the police to have believed that Martin possessed common authority over the apartment. The court based this determination on its findings that Martin told the police that both she and the defendant lived in the apartment, that Martin had personal

---

[8] The court noted that Martin freely gave consent for the police to enter the apartment. Specifically, it concluded that there was no display of weapons by the police or show of force, Martin was not in handcuffs and it was Martin who initiated the idea of entering the apartment, not the police officers.

[9] The United States Supreme Court repeatedly has noted the need to allow police officers to take reasonable steps to protect their personal safety in light of the recognition that "American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded." *Terry* v. *Ohio*, 392 U.S. 1, 23, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); see also *Arizona* v. *Gant*, 556 U.S. 332, 337, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) (recognizing that "search-incident-to-arrest" exception to the warrant requirement derives from interests in officer safety).

items in the apartment, that the defendant was present outside the apartment and did not object when the police entered the apartment with Martin and because the police knew that Martin was the defendant's girlfriend.[10] The court also relied on *State* v. *Vazquez*, 87 Conn. App. 792, 867 A.2d 15, cert. denied, 273 Conn. 934, 875 A.2d 544 (2005), in which this court, without adopting the apparent authority doctrine, held that it was reasonable for the police to rely on the apparent authority of the defendant's girlfriend when she answered the door and told the police that she lived in the apartment with the defendant, although she in fact did not live there. Finally, citing *Georgia* v. *Randolph*, 547 U.S. 103, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006),[11] the court concluded that the police were not obligated to ask the defendant for his consent prior to entering the apartment even though he was nearby.[12]

On November 5, 2008, after a jury trial, the defendant was found guilty on all counts. On January 9, 2009, the

[10] Our Supreme Court previously has concluded that warrantless searches are permissible if they are based on consent. "It is axiomatic that [a] warrantless search [or entry into one's home] is not unreasonable under either the fourth amendment to the constitution of the United States or article first, § 7, of the constitution of Connecticut if a person with authority to do so has freely consented . . . . The question whether consent to a search has in fact been freely and voluntarily given, or was the product of coercion, express or implied, is *a question of fact* to be determined from the totality of all the circumstances." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Reagan*, 209 Conn. 1, 7–8, 546 A.2d 839 (1988).

[11] In *Georgia* v. *Randolph*, supra, 547 U.S. 103, the court concluded that consent of an individual with apparent authority is sufficient to authorize a warrantless search. Specifically, it concluded that it would "needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received." Id., 122.

[12] The court concluded that there was nothing in the evidence that suggested that the defendant objected to the police entering the apartment or that he declined to sign a written consent to search.

court sentenced the defendant to a total effective term of forty years imprisonment and fifteen years of special parole. This appeal followed.

The defendant claims that the trial court erred in not granting his motion to suppress the evidence seized from his apartment because our state constitution prohibits searches based on apparent authority. Specifically, the defendant argues that, pursuant to *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225 (1992), article first, § 7, of the constitution of Connecticut provides greater protection than the fourth amendment to the United States constitution, and, therefore, searches based on apparent authority violate the rights of Connecticut citizens.

The defendant failed to raise this state constitutional claim before the trial court and now seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[13] "Under the *Golding* doctrine, a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two prongs of *Golding* address the reviewability of the claim, and the last two involve the merits of the claim." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Paulino*, 127 Conn. App. 51, 61, 12 A.3d 628 (2011).

---

[13] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. . . ."

We conclude that the first two prongs of *Golding* are satisfied because the record is adequate for review and the defendant is alleging a violation of his right to be free from unreasonable searches as provided for in our state constitution. Specifically, as noted, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

We conclude, however, that the defendant has not satisfied the third prong of *Golding* because the alleged constitutional violation of his rights pursuant to article first, § 7, of the constitution of Connecticut does not clearly exist. After considering the public policy behind the enactment of article first, § 7, prior case law from this state and our sister states and other relevant public policies, we conclude that the apparent authority doctrine does not violate our state constitution, and, accordingly, affirm the judgment of the court.

The right to be free from unreasonable searches is a fundamental right recognized under our state and federal constitutions. "Ordinarily, police may not conduct a search unless they first obtain a search warrant from a neutral magistrate after establishing probable cause. [A] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . . These exceptions have been jealously and carefully drawn . . . and the burden is on the state to establish the exception." (Internal quotation marks omitted.) *State* v. *Owen*, 126 Conn. App. 358, 364, 10 A.3d 1100, cert. denied, 300 Conn. 921, 14 A.3d 1008 (2011).

Pursuant to its interpretation of the fourth amendment to the United States constitution, the United States

Supreme Court carefully has laid out the exceptions to the requirements of the fourth amendment; however, not every exception is necessarily lawful under the Connecticut constitution. See, e.g., *State* v. *Geisler,* supra, 222 Conn. 690 (declining to follow *New York* v. *Harris,* 495 U.S. 14, 110 S. Ct. 1640, 109 L. Ed. 2d 13 [1990], and concluding that pursuant to article first, § 7, statement taken from defendant outside his home just after he has been illegally arrested in his house violates exclusionary rule); *State* v. *Marsala,* 216 Conn. 150, 171, 579 A.2d 58 (1990) (holding that a good faith exception to the exclusionary rule does not exist under Connecticut law). "It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . Furthermore, although we often rely on the United States Supreme Court's interpretation of the amendments to the constitution of the United States to delineate the boundaries of the protections provided by the constitution of Connecticut, we have also recognized that, in some instances, our state constitution provides protections beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. . . . The analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum is well settled.

"In *State* v. *Geisler,* [supra, 222 Conn. 684–86], we enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts;

and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." (Internal quotation marks omitted.) *State* v. *Tomas D.*, 296 Conn. 476, 503–504, 995 A.2d 583 (2010). We have considered each of the *Geisler* factors and, in doing so, reach the conclusion that the apparent authority doctrine is compatible with our state constitution for the following reasons.

I

PERSUASIVE RELEVANT FEDERAL PRECEDENTS

Relevant federal precedents clearly favor the adoption of the apparent authority doctrine as an exception to the warrant requirement under Connecticut law. The basis for the adoption of the apparent authority doctrine was first set forth in *United States* v. *Matlock*, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). In *Matlock*, the police arrested the respondent in connection with his involvement in a bank robbery. Id., 166. The arrest occurred in the front yard of the house in which the defendant lived with several others, including the daughter of the lessees. Id. The daughter of the lessees consented to the search of the house and the bedroom she occupied with the respondent for evidence connecting the respondent to the robbery. Id. The police discovered $4995 in cash in the bedroom, and the respondent later moved to suppress this evidence. Id.

The Supreme Court upheld the warrantless search of the house and bedroom. Id., 166, 177. Specifically, the court concluded that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." Id., 170. The court further concluded that "[t]he authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements . . .

but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (Citations omitted.) Id., 171 n.7. The court, however, reserved the issue of whether a warrantless entry is valid when it is based upon the consent of a third party who the police, at the time of the entry, reasonably believed possessed common authority over the premises, but in fact did not. See *Illinois* v. *Rodriguez*, supra, 497 U.S. 179.

In *Illinois* v. *Rodriguez*, supra, 497 U.S. 177, the Supreme Court expanded on its holding in *Matlock* and addressed the issue of whether the apparent authority doctrine is a valid exception to the warrant requirement. Id., 186. In that case, the police entered the respondent's home with the consent of Gail Fischer, a woman who had lived with the respondent for several months, to investigate allegations that the respondent had assaulted Fischer. Id., 179–80. During a conversation with the police, Fischer referred to the respondent's apartment as " 'our' " apartment, and said that she had clothes and furniture there. Id., 179. When the police arrived at the apartment, Fischer unlocked the door with her key and gave the officers permission to enter. Id., 180. While in the apartment, the police observed, in plain view, drug paraphernalia and containers filled with white powder, which they believed to be cocaine. Id. The police entered the respondent's bedroom, where they discovered additional containers of white powder. Id. The respondent was charged with possession of a controlled substance with intent to deliver and moved to suppress all evidence seized from his apartment because Fischer had vacated the apartment several weeks earlier and had no authority to consent to the

search. Id. The Illinois trial court granted the motion to suppress, holding that Fischer did not have common authority to consent to the search, and the Appellate Court of Illinois affirmed. Id. The Illinois Supreme Court thereafter denied the state's petition for leave to appeal. Id.

The United States Supreme Court reversed the judgment of the appellate court and concluded that the warrantless entry by the police was valid. Id., 185, 189. The court first noted that "[w]hat [the respondent] is assured by the Fourth Amendment itself . . . is not that no government search of his house will occur unless he consents; but that no such search will occur that is 'unreasonable.' " Id., 183. The court then adopted the apparent authority doctrine as an exception to the warrant requirement, holding that "[i]t is apparent that in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable." Id., 185–86. Furthermore, the court reasoned that "[t]he Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape." Id., 186. Finally, the court concluded that "[a]s with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an *objective* standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?"

(Emphasis added; internal quotation marks omitted.) Id., 188.

The precedents set in *Matlock* and *Rodriguez* have been followed by federal circuit courts, including the United States Court of Appeals for the Second Circuit.[14] See, e.g., *United States* v. *Sparks*, 287 Fed. Appx. 918, 920 (2d Cir. 2008). The federal courts have declined to apply the apparent authority doctrine, however, when the authority to search an area is based on an erroneous view of the law. This occurred in *United States* v. *Brown*, 961 F.2d 1039 (2d Cir. 1992), when the investigating officer believed that he had the authority to enter the defendant's apartment because a third party, who was authorized to enter the defendant's apartment when necessary to turn off electrical appliances or lights, consented to a search of the apartment. Id., 1040. The Second Circuit rejected the government's argument pursuant to *Rodriguez* and concluded that *Rodriguez* would not validate a search premised upon an erroneous view of the law. Id., 1041. The Second Circuit stated that "the investigating officer concluded that because [the third party] was authorized to enter [the defendant's] apartment when necessary to turn off electrical appliances or lights, she could consent to a search of his apartment. This was not a reasonable, although factually erroneous, belief based upon the facts presented to the officer, but rather a misapprehension of the applicable rule of law." Id.

The defendant points to *Stoner* v. *California*, 376 U.S. 483, 84 S. Ct. 889, 11 L. Ed. 2d 856 (1964), a pre-*Rodriguez* case, in support of his argument against

---

[14] Although *Rodriguez* has been followed by the federal courts of appeal and many state courts; see part V of this opinion; it has also received critical commentary by legal scholars. See, e.g., T. Davies, "Denying a Right by Disregarding Doctrine: How *Illinois v. Rodriguez* Demeans Consent, Trivializes Fourth Amendment Reasonableness, and Exaggerates the Excusability of Police Error," 59 Tenn. L. Rev. 1, 10 (1991) (arguing that *Rodriguez* is based on three doctrinal claims that distort prior doctrine).

adoption of the apparent authority doctrine. In *Stoner*, the United States Supreme Court concluded that it was unlawful for the police to conduct a warrantless search of the petitioner's hotel room, with the consent of only the hotel desk clerk. Id., 490. In *Rodriguez*, however, the court concluded that the facts of *Stoner* were distinguishable from the facts before it. *Illinois* v. *Rodriguez*, supra, 497 U.S. 188. The court concluded "that the police [in *Stoner*] could not rely upon the obtained consent because they knew it came from a hotel clerk, knew that the room was rented and exclusively occupied by the defendant, and could not reasonably have believed that the former had general access to or control over the latter." Id.

Unlike the situation in *Stoner*, several factors in the present case indicate that it was reasonable; see *Illinois* v. *Rodriguez*, supra, 497 U.S. 177; for the police to believe that Martin had control over the apartment and that she could consent to the entry. Most notably, Martin told the police that she lived in the defendant's apartment. Additionally, the police were aware that Martin was the defendant's girlfriend and that she had personal belongings in the apartment. Finally, when the police entered the apartment with Martin, in the presence of the defendant, the defendant did not object.

## II

### THE TEXT OF THE OPERATIVE CONSTITUTIONAL PROVISIONS

A textual comparison of article first, § 7, of the constitution of Connecticut and the fourth amendment to the United States constitution supports adoption of the apparent authority doctrine. As noted, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from *unreasonable searches* or seizures; and no warrant to search any

place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation." (Emphasis added.) The fourth amendment similarly provides: "The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable searches* and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (Emphasis added.)

Our Supreme Court has stated that "this court repeatedly has observed that the language of article first, § 7, of the state constitution closely resembles the language of the fourth amendment to the federal constitution. . . . That linguistic similarity undermines [a] defendant's contention that the state constitution provides a greater opportunity to challenge the legality of a search than the federal constitution. The similarity denotes a common source and, thus, [supports] a common interpretation of the provisions. . . . Further support for such a common interpretation is the fact that the language of article first, § 7, was adopted with little debate." (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 283 Conn. 280, 306–307, 929 A.2d 278 (2007).[16]

---

[16] The *Davis* court did note, however, that "although we often rely on the United States Supreme Court's interpretation of the amendments to the constitution of the United States to delineate the boundaries of the protections provided by the constitution of Connecticut, we have also recognized that, in some instances, our state constitution provides protections beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. . . . Indeed, this court has determined that, in certain respects, article first, § 7, of the state constitution affords greater protection than the fourth amendment to the United States constitution. E.g., *State* v. *Miller*, 227 Conn. 363, 377, 630 A.2d 1315 (1993) (article first, § 7, requires police to obtain warrant to search impounded automobile); *State* v. *Geisler*, [supra, 222 Conn. 691–92] (emergency exception to warrant requirement is narrower under article first, § 7, than under federal constitution); *State* v. *Marsala*, [supra, 216 Conn. 171] (good faith

The similarities between the fourth amendment and article first, § 7, although not dispositive, help guide our resolution of the present issue. As noted, the *Rodriguez* court concluded that, pursuant to the text of the fourth amendment, the federal constitution only protects against unreasonable searches by the state and that the apparent authority doctrine was not inconsistent with that protection. *Illinois* v. *Rodriguez,* supra, 497 U.S. 183, 185–86. The court adopted the apparent authority doctrine because it concluded that the fourth amendment was not violated if the police *reasonably* believed that a third party, who has consented to their entry, has control of the premises. Id., 185. This interpretation influences our reading of article first, § 7, because, like the fourth amendment, article first, § 7, also protects against "unreasonable searches" rather than providing a more general right, such as a right to privacy. It is consistent, therefore, with the language of article first, § 7, to adopt an exception to the warrant requirement, as the *Rodriguez* court did, that permits the police to enter and search an area when they reasonably and in good faith believe they have been given consent to do so, although that belief may be factually erroneous.

## III

### HISTORICAL INSIGHTS INTO THE INTENT OF OUR CONSTITUTIONAL FOREBEARS

Both this court and our Supreme Court have concluded that article first, § 7, and the fourth amendment to the United States constitution were enacted in response to the same concerns and, therefore, should be interpreted similarly. Specifically, our Supreme

---

exception to warrant requirement does not exist under article first, § 7, of state constitution); *State* v. *Dukes,* 209 Conn. 98, 120–21, 547 A.2d 10 (1988) (search incident to arrest exception to warrant requirement is narrower under article first, § 7, than under federal constitution)." (Citation omitted; internal quotation marks omitted.) *State* v. *Davis,* supra, 283 Conn. 305–306.

Court has concluded that the Connecticut "declaration of rights adopted in 1818 appears to have its antecedents in the Mississippi constitution of 1817, which in turn derived from the federal bill of rights and the Virginia declaration of rights of 1776. . . . The search and seizure provision in our 1818 constitution, then article first, § 8, closely resembles the fourth amendment to the United States constitution. Although its enumeration was changed to article first, § 7, when the 1965 constitution incorporated article first, § 4, into article seventh, its language has not been altered since its original adoption. . . . The language of article first, § 7, which was based upon the fourth amendment, was adopted with little debate. . . . Thus, the circumstances surrounding the adoption of article first, § 7, lend weight to the view that, in most cases, a practice permitted under the fourth amendment is permissible under article first, § 7." (Internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 267, 3 A.3d 806 (2010).

This court also has concluded: "Because the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution were enacted in response to the same historical experience and protect the same fundamental values, the early history of the provisions may be analyzed together. . . . The Fourth Amendment is a restraint on Executive power. The Amendment constitutes the Framers' direct constitutional response to the unreasonable law enforcement practices employed by agents of the British Crown. . . . [C]onstitutional provisions such as the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution were enacted to ensure that the newly formed federal or state governments could not employ the two devices used by the British Crown that they believed jeopardized the liberty of every citizen: the general warrant and the writ of

assistance." (Citations omitted; internal quotation marks omitted.) *State* v. *Miller*, 29 Conn. App. 207, 217–18, 614 A.2d 1229 (1992), aff'd, 227 Conn. 363, 630 A.2d 1315 (1993).

The defendant argues that early Connecticut citizens valued privacy, especially relating to the home, and that the adoption of the apparent authority doctrine runs counter to the intent behind the adoption of what is now article first, § 7. As noted, however, our appellate courts have found that article first, § 7, is not only based on the fourth amendment, but also that it was adopted with little debate.[16] Additionally, the fourth amendment was adopted to address the same concerns over privacy that the defendant maintains was the intent behind article first, § 7. "The Framers' concern with preventing breaches of the privacy of the house is evident from their determination to prevent issuance of general warrants. . . . [A]ll of the state constitutional provisions and anti-Federalist proposals for a federal provision stated that too-loose warrants 'ought not be granted' or 'shall not be issued.' . . . Indeed, the final motion to amend Madison's draft language for the Fourth Amendment was aimed precisely at inserting this imperative language to make it clear that non-specific warrants 'shall [not be] issued.'" (Citation omitted.) T. Davies, "Recovering the Original Fourth Amendment," 98 Mich. L. Rev. 547, 577 n.67 (1999).

## IV

## RELATED CONNECTICUT PRECEDENTS

No Connecticut court explicitly has adopted the apparent authority doctrine under the constitution of

---

[16] Although our Supreme Court departed from United States Supreme Court precedent in *State* v. *Marsala*, supra, 216 Conn. 150, and *State* v. *Geisler*, supra, 222 Conn. 672, the court's decision "did not rest on any textual or historical distinction between the fourth amendment and article first, § 7." *State* v. *Miller*, supra, 29 Conn. App. 223.

Connecticut; however, this court has applied the doctrine in the context of a criminal investigation. This court, citing *Illinois* v. *Rodriguez*, supra, 497 U.S. 177, concluded in *State* v. *Vasquez*, supra, 87 Conn. App. 792, that the police did not violate the defendant's constitutional rights when they obtained consent from his girlfriend to enter his home. Id., 804. The court stated: "Here, [Bridgeport police Detective Jeremy] DePietro and the other officers arrived at the defendant's apartment and were greeted by the defendant's girlfriend, [Michelle Rosado] who told them that she lived in the home with her children and that no other adults were in the apartment at that time. While the officers had reason to believe that the defendant resided in the apartment, in addition to Rosado, they had no reason to believe that Rosado was lying to them about residing there with her two children, especially because her children were in the apartment with her during the night. Under those circumstances, it was reasonable for DePietro and the other officers to believe that Rosado lived in the apartment and had equal access to and common authority over all the rooms in the apartment, including the one in which the police subsequently found the defendant. The court, therefore, properly denied the defendant's motion to suppress." Id. Earlier, the court had stated: "In addition, a warrantless search is valid when it is based on the consent of a third party who the police, at the time of the search, reasonably believe possesses common authority over the premises but who in fact does not have such authority. *Illinois* v. *Rodriguez*, [supra, 181]. As with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" (Internal quotation marks omitted.) *State* v. *Vasquez*, supra,

804;[17] see also *State* v. *Yusuf*, 70 Conn. App. 594, 604, 800 A.2d 590 (citing *Rodriguez* for proposition that "a warrantless search is valid when it is based on the consent of a third party who the police, at the time of the search, reasonably believe possesses common authority over the premises but who in fact does not have such authority"), cert. denied, 261 Conn. 921, 806 A.2d 1064 (2002).

The apparent authority doctrine, therefore, for all intents and purposes, has been applied by this court under factually similar situations as those present in the case at hand. As in *Vasquez*, Martin specifically had told the police that she lived in the defendant's apartment. Although Martin did not have children with her at the time, other factors supported her claim such as the fact that the defendant did not object when the police entered the apartment with Martin and the fact that she had personal belongings in the apartment.[18]

V

PERSUASIVE PRECEDENTS OF
OTHER STATE COURTS

A slight majority of state courts have found the apparent authority doctrine to be consistent with their state constitutions. Appellate courts in Idaho, Indiana, Massachusetts, New Hampshire and Pennsylvania all have adopted the apparent authority doctrine as recognized in *Rodriguez*. See *State* v. *McCaughey*, 127 Idaho 669, 673–74, 904 P.2d 939 (1995); *Lee* v. *State*, 849 N.E.2d 602, 610 (Ind. 2006), cert. denied, 549 U.S. 1211, 127 S.

---

[17] The court did not base its analysis of the apparent authority doctrine on article first, § 7.

[18] Although the apparent authority doctrine was never discussed in *State* v. *Fields*, 31 Conn. App. 312, 624 A.2d 1165, cert. denied, 226 Conn. 916, 628 A.2d 989 (1993), or whether the defendant's girlfriend had common authority over the premises, the court agreed with the trial court's finding that the girlfriend gave the police valid permission to search the defendant's apartment. Id., 324 n.5.

Ct. 1331, 167 L. Ed. 2d 84 (2007); *Commonwealth* v. *Porter P.,* 456 Mass. 254, 271, 923 N.E.2d 36 (2010); *State* v. *Sawyer,* 147 N.H. 191, 196, 784 A.2d 1208 (2001), cert. denied, 537 U.S. 822, 123 S. Ct. 107, 154 L. Ed. 2d 31 (2002); *Commonwealth* v. *Strader,* 593 Pa. 421, 427, 931 A.2d 630 (2007), cert. denied, 552 U.S. 1234, 128 S. Ct. 1452, 170 L. Ed. 2d 281 (2008); see also *State* v. *Kieffer,* 217 Wis. 2d 531, 548–50, 577 N.W.2d 352 (1998) (accepting that apparent authority doctrine is exception to warrant requirement and effectively adopting it under state law in dicta). In *Commonwealth* v. *Porter P.,* supra, 254, the Massachusetts Supreme Judicial Court concluded: "[W]e do not believe that art. 14 [of our state constitution] is violated if a warrantless search of a home occurs after a police officer obtains the voluntary consent of a person he reasonably believes, after diligent inquiry, has common authority over the home, but it turns out that the person lacked common authority. See *Illinois* v. *Rodriguez,* [supra, 497 U.S. 186]. Apparent authority in the context of consent to search is a police officer's finding of actual authority based on a reasonable mistake of fact. While we conclude that a search of a home does not violate art. 14 if the police officer has the voluntary consent of an individual with the apparent authority to give such consent, we do so only if the reasonable mistake of fact occurs despite diligent inquiry by the police as to the consenting individual's common authority over the home." *Commonwealth* v. *Porter P.,* supra, 271.

The apparent authority doctrine has been rejected by courts in at least five states. The defendant argues that the split in authority among the jurisdictions means that the law from our sister states "is a lot less helpful than it could have been." We disagree. Those jurisdictions that have rejected the apparent authority doctrine have done so for reasons we find unpersuasive to our resolution of the issue before us.

Courts in Hawaii, Montana and Washington have rejected the apparent authority doctrine, relying on provisions within their respective state constitutions which provide their citizens with a right to privacy against invasion by the state.[19] See *State* v. *Lopez*, 78 Haw. 433, 445, 446, 896 P.2d 889 (1995) ("unlike its federal counterpart, article I, section 7, specifically protects against 'invasions of privacy' "); *State* v. *McLees*, 298 Mont. 15, 25, 994 P.2d 683 (2000) ("[u]nlike its federal counterpart, Article II, Section 10 protects against invasions of privacy"); *State* v. *Morse*, 156 Wn. 2d 1, 9, 14–15, 123 P.3d 832 (2005) ("Unlike in the Fourth Amendment, the word 'reasonable' does not appear in any form in the text of article I, section 7 of the Washington Constitution. . . . The Washington Constitution guarantees to its citizens that they will neither be disturbed in their private affairs, nor have their homes invaded, without authority of law." [Citations omitted.]). These cases are distinguishable because the constitution of Connecticut, including article first, § 7, does not provide for a broad right of privacy but rather protects against unreasonable searches. The *Morse* court also acknowledged that the Washington state constitution does not contain the word "reasonable" in its section concerning searches and seizures. *State* v. *Morse*, supra, 9. The case law from Hawaii, Montana and Washington, therefore, is not persuasive.

---

[19] Article first, § 7, of the constitution of Hawaii provides: "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted." Article second, § 10, of the constitution of Montana provides: "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Article first, § 7, of the constitution of Washington provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

In *State* v. *Carsey*, 295 Or. 32, 664 P.2d 1085 (1983), the Oregon Supreme Court rejected the apparent authority doctrine; however, it did so seven years before the United States Supreme Court decided *Illinois* v. *Rodriguez*, supra, 497 U.S. 177. See *State* v. *Carsey*, supra, 45–46. We find the United States Supreme Court's discussion of the apparent authority doctrine in *Rodriguez* germane to the issue before us and, therefore, conclude that *Carsey* is unhelpful to our decision.

Finally, the New Mexico Supreme Court rejected the apparent authority doctrine on the basis of earlier state precedent rejecting the good faith exception to the exclusionary rule first recognized in *United States* v. *Leon*, 468 U.S. 897, 922, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984).[20] See *State* v. *Wright*, 119 N.M. 559, 564–65, 893 P.2d 455 (App.), cert. denied, 119 N.M. 389, 890 P.2d 1321 (1995). Connecticut also has rejected the good faith exception to the exclusionary rule under our state constitution. See *State* v. *Marsala*, supra, 216 Conn. 171. We conclude, however, that the apparent authority doctrine does not conflict with our Supreme Court's finding that the good faith exception to the exclusionary rule is incompatible with article first, § 7.

The apparent authority doctrine and the good faith exception to the exclusionary rule are not so doctrinally intertwined that we are required to reject the apparent authority doctrine pursuant to *Marsala*. The apparent authority doctrine is an exception to the *warrant requirement*. The good faith exception to the exclusionary rule, on the other hand, applies when a warrantless

---

[20] "In *Leon*, after accepting the Court of Appeals' conclusion that probable cause [for issuance of a search warrant] was lacking under the prevailing legal standards . . . the United States Supreme Court held, nevertheless, that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." (Citation omitted; internal quotation marks omitted.) *State* v. *Marsala*, supra, 216 Conn. 160–61.

search has occurred but there is *no* exception to the warrant requirement, such as a search pursuant to a defective warrant. Additionally, in recognizing the apparent authority doctrine, the *Rodriguez* court makes no reference to *Leon*. This suggests that the basis for the apparent authority doctrine is independent of the good faith exception to the exclusionary rule.

Although the Idaho Supreme Court also has rejected the good faith exception to the exclusionary rule, it found no contradiction in adopting the apparent authority doctrine. In *McCaughey*, the court concluded: "The district court reasoned that *Rodriguez* was founded in part upon the *Leon* good faith exception principles, and that because Idaho did not follow these principles in [*State* v. *Guzman*, 122 Idaho 981, 842 P.2d 660 (1992)] and [*State* v. *Josephson*, 123 Idaho 790, 852 P.2d 1387 (1993)], Idaho should not follow *Rodriguez*. The majority opinion in *Rodriguez* does not rely upon *Leon* good-faith principles. The thrust of the *Rodriguez* opinion was that the Fourth Amendment has not required that police and magistrate judges always be factually correct, but rather the proper focus is whether government conduct was *objectively reasonable*. *Rodriguez* applied these general principles to the consent search setting. The Supreme Court's reasoning was not dependent upon the existence of a good faith exception to the exclusionary rule. In fact, the only time the majority opinion mentioned 'good faith' was in its example of a factually incorrect arrest (wrong person arrested) that nonetheless was held reasonable." (Emphasis added.) *State* v. *McCaughey*, supra, 127 Idaho 674; see also *Commonwealth* v. *Porter P.*, supra, 456 Mass. 274 ("[b]ecause apparent authority is not based on the 'good faith' exception to the exclusionary rule, there is no logical conflict in our adopting apparent authority but not the 'good faith' exception").

## VI

## CONTEMPORARY UNDERSTANDINGS OF RELEVANT PUBLIC POLICIES

Adoption of the apparent authority doctrine will promote effective law enforcement with only minimal intrusion on the right of citizens to be free from unreasonable searches. As noted, the police do not need to obtain a search warrant if they receive valid consent to enter upon and search a physical location. See *State v. Reagan*, 209 Conn. 1, 7–8, 546 A.2d 839 (1988). Without the apparent authority doctrine, if, after a diligent inquiry, a police officer reasonably believes that a third party has consented to a search, the officer will feel obligated to conduct an extensive investigation to ensure that the consent is valid.

The defendant relies on our Supreme Court's policy reasons for rejecting the good faith exception to the exclusionary rule articulated in *State v. Marsala*, supra, 216 Conn. 171, to support his claim that adoption of the apparent authority doctrine will have a detrimental effect on due process for criminal cases, the public's perception of due process for criminal cases and police practices. We conclude that the defendant's concerns are exaggerated.

In *Marsala*, our Supreme Court concluded that "the good faith exception would encourage some police officers to expend less effort in establishing the necessary probable cause to search and more effort in locating a judge who might be less exacting than some others when ruling on whether an affidavit has established the requisite level of probable cause," and that "the exception for good faith reliance upon a warrant implicitly tells magistrates that they need not take much care in reviewing warrant applications, since their mistakes will from now on have virtually no consequence . . . ." (Internal quotation marks omitted.) Id., 169. Finally, the

court, citing the dissent in *United States* v. *Leon,* supra, 468 U.S. 897, concluded that "[i]f evidence is consistently excluded in these circumstances, police departments will surely be prompted to instruct their officers to devote greater care and attention to providing sufficient information to establish probable cause when applying for a warrant, and to review with some attention the form of the warrant that they have been issued, rather than automatically assuming that whatever document the magistrate has signed will necessarily comport with Fourth Amendment requirements." (Internal quotation marks omitted.) *State* v. *Marsala,* supra, 216 Conn. 171.

The policy concerns of the *Marsala* court, as they relate to the good faith exception to the exclusionary rule, are minimally present, if at all, with respect to the apparent authority doctrine. First, because the apparent authority doctrine is an *exception* to the warrant requirement, the police will not spend more time searching for a judge who might be less exacting when ruling on whether an affidavit has established probable cause. Also, there is no concern that this exception will implicitly tell magistrates that they do not need to take much care in reviewing warrant applications. Second, because the apparent authority doctrine only applies when the police *reasonably* believe that a third party had authority to consent to the search, police departments will still be prompted to instruct their officers to devote greater care and attention in their investigations because anything less than a diligent inquiry will result in the suppression of evidence. In other words, adoption of the apparent authority doctrine will not permit police to rely on the consent of a third party if there is undue ambiguity as to whether that person can consent to the search. The police must reasonably believe, in good faith, that the third party has authority to consent to the search based on an objective standard.

To protect against the concerns articulated in *Marsala*, therefore, we conclude that a warrantless entry by the police pursuant to the apparent authority doctrine is valid only when it is based on the consent of a third party who the police, at the time of the entry, reasonably believe possesses common authority over the premises, but, in reality, does not. The reasonableness of the belief must be measured by an objective standard. See *Illinois v. Rodriguez*, supra, 497 U.S. 186, 188. Additionally, this conclusion must be made after an appropriate inquiry given the factual circumstances facing the police as to the third party's common authority over the premises.[21] Each case, of course, must be judged in light of its own facts and circumstances.

We are sensitive to the concerns that, in some instances, police might improperly seek to obtain consent to search from someone lacking authority to give such consent. We are confident, however, that if such instances occur, aggressive defense lawyers will be able to invoke court processes to protect their clients' rights to be free from unreasonable searches.

In the present case, Martin invited the police into the apartment. She not only told the police that she lived in the apartment, but the defendant did not object when the police entered his apartment with Martin and Martin's personal belongings were in the defendant's apartment. It was reasonable for the police to believe that

---

[21] In his treatise on searches and seizures, Wayne LaFave cites to precedent from the federal courts of appeal to address certain circumstances in which it would not be reasonable for the police to conclude that a third party has the authority to consent to a warrantless search. His treatise provides: "[I]t cannot be reasonable to rely on a certain theory of apparent authority, when the police themselves know what the consenting party's *actual* authority is. For another, it is not correct for a court to uphold a search merely upon the ground that the person giving the consent believed he was legally empowered to give it." (Emphasis in original; internal quotation marks omitted.) 4 W. LaFave, Search and Seizure (4th Ed. 2004) § 8.3 (g), p. 174. We agree with these conclusions.

Martin had common authority over the apartment. Pursuant to the apparent authority doctrine, we conclude that the police did not violate the defendant's rights pursuant to article first, § 7, of the constitution of Connecticut, and, therefore, the defendant has not satisfied the third prong of *Golding*.

The judgment is affirmed.

In this opinion the other judges concurred.