******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ROBERT S. BUIE
(SC 18887)

Rogers, C. J., and Palmer, Zarella, McDonald, Espinosa, Robinson and Vertefeuille, Js.*

*Argued March 20—officially released July 22, 2014*

*Neal Cone*, senior assistant public defender, for the appellant (defendant).

*Bruce R. Lockwood*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *John J. Davenport*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

PER CURIAM. The United States Supreme Court has recognized an apparent authority doctrine, under which "a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not do so." *Illinois* v. *Rodriguez*, 497 U.S. 177, 179, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990). The sole issue in this certified appeal is whether the Appellate Court properly determined that, in the context of a search of a private home, the apparent authority doctrine does not violate article first, § 7, of the constitution of Connecticut. *State* v. *Buie*, 303 Conn. 903, 31 A.3d 1179 (2011). We agree with the Appellate Court that application of this doctrine in such circumstances does not offend the right of Connecticut citizens to be free from unreasonable searches under article first, § 7. Accordingly, we affirm the Appellate Court's judgment affirming the trial court's judgment of conviction of the defendant, Robert S. Buie, rendered after a jury trial at which evidence obtained from the defendant's home was deemed admissible under the apparent authority doctrine. *State* v. *Buie*, 129 Conn. App. 777, 807, 21 A.3d 550 (2011).

The defendant was convicted of two counts of aggravated sexual assault in the first degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-70 (a) (1), and one count each of attempt to commit aggravated sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70a (a) (1), conspiracy to commit aggravated sexual assault in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-70a (a) (1), and burglary in the first degree in violation of General Statutes § 53a-101 (a) (1). The Appellate Court's opinion sets forth the following facts, which the jury reasonably could have found in support of its verdict, and procedural history of the case, which we set forth in abbreviated form. "In September, 2005, LB[1] moved into [a townhouse apartment building next to a similar building where the defendant resided in the same] residential complex (complex). Upon moving into her new apartment, LB first encountered the defendant, and, approximately one month later, LB also met the defendant's girlfriend, Beverly Martin. [The three of them socialized occasionally.]

"On [November 19, 2006, at approximately 1:30 a.m.] . . . LB fell asleep on her living room couch, and, at approximately 4:26 a.m., with her apartment completely dark, she awoke to what she believed was a gun pressed against her head.

"The person holding the gun to her head ordered LB to put her hands behind her back. LB recognized the voice as that of the defendant. A man later identified as the defendant then forced LB to put her arms behind

her back and put a piece of duct tape over her mouth and also bound her hands together with duct tape. With her pants removed, the defendant and Martin then took turns inserting a dildo into LB's vagina and rectum while holding the gun to her head.[2] When they were finished, the defendant inserted his penis into LB's vagina.

"After the defendant and Martin left LB's apartment, LB went to a neighbor's apartment [because she was unable to find a working telephone in her apartment] and had the neighbor call the police. [At approximately 5:30 a.m.] Officer Joseph Farina arrived at the complex and spoke to LB. LB told Farina that the defendant and Martin had raped her. After an ambulance transported LB to the hospital, Farina and several officers [went to the building next door to look for the defendant, with Farina starting at the back of the building. When he eventually arrived at the front of the building] Farina found the defendant sitting in front of the [building], speaking with [the other] officers.

"Sergeant Michael Slavin arrived at the complex at approximately 7 a.m. [at which time several police officers on the scene were separately questioning the defendant and Martin in front of the defendant's apartment]. Slavin learned that the defendant and Martin were willing to go to the detective bureau for further questioning about the incident involving LB. Prior to departing the complex, Martin stated that she wanted to retrieve some items from 'her room.' Without prompting, Martin stated to Slavin, 'I suppose you guys want to come with me . . . .' Slavin agreed, and Detective Richard Baxter and another detective accompanied Martin into the apartment. While in the apartment, Baxter observed something that he believed was connected to the sexual assault. When he exited the apartment, he told Slavin about what he had seen in the defendant's apartment. Officers secured the apartment, and the defendant and Martin were transported to the detective bureau. Later, after the police obtained a search warrant for the defendant's apartment, they recovered, among other things, a flesh-colored dildo, a black dildo, two BB guns, a container of BBs and a roll of duct tape. . . .

"[At trial following his arrest] the defendant filed a motion to suppress all evidence seized from his apartment. Specifically, the defendant claimed that because Martin did not live with him in his apartment, the 'police were without authority to enter into the apartment without [his] consent in the course of conducting [their] investigation,' and, therefore, they violated his state and federal constitutional rights. . . . [At] a hearing on the defendant's motion . . . [t]he defendant testified that Martin only had access to his apartment when he also was present in the apartment, that Martin's name was not on the lease and that only he and his former wife had keys to the apartment. He also claimed that he and Martin were not in a romantic relationship and were

nothing more than friends. [He conceded, however, that he and Martin occasionally had sex.] Finally, the defendant argued that because he was present at the scene, the police were obligated to obtain his permission before entering the apartment.

"Slavin also testified at the hearing and stated that on November 19, 2006, the police did not know who held the lease for the defendant's apartment. He claimed, however, that 'I feel that [Martin] said she was living there. She obviously had personal belongings there. We felt she established residency there. Therefore . . . she was able to give consent for the officers to go in with her.' When asked whether the defendant told him that Martin lived in the apartment, Slavin responded that 'Ms. Martin told us she lived there.'

"[The trial] court denied the defendant's motion to suppress in an oral decision. Before issuing its decision, the court made several findings of fact. The court first concluded that Slavin was in charge of the police investigation of the sexual assault and that when he arrived at the complex, he met with the defendant and Martin, who were not under arrest at the time. The court then concluded that Martin had indicated that before she was willing to go to the police station, she needed to obtain some personal belongings that were in the apartment, specifically, keys and a cellular telephone. She stated to the officers, 'I suppose you guys want to come in with me.' The court found that the police agreed to follow Martin because 'the police at the time knew details of the alleged sexual assault, and they knew that a handgun had been involved in the sexual assault and they were concerned for officer safety because they had reason to believe that the handgun might be in the apartment . . . that . . . Martin was entering to retrieve her belongings. That the police did not go into the apartment with any intent to search the apartment for evidence or any intent to seize any items. Their intent was solely to accompany . . . Martin for officer safety.'

"After making these factual findings, the court, citing *Illinois* v. *Rodriguez*, [supra, 497 U.S. 177], stated that 'a warrantless search is valid when it is based on the consent of a third party whom the police, at the time of the search, reasonably believe possesses common authority over the premises but who in fact does not have such authority.' The court concluded that Martin voluntarily provided the police with permission to enter the apartment and that it was reasonable for the police to have believed that Martin possessed common authority over the apartment. The court based this determination on its findings that Martin told the police that both she and the defendant lived in the apartment, that Martin had personal items in the apartment, that the defendant was present outside the apartment and did not object when the police entered the apartment with

Martin and [that] the police knew that Martin was the defendant's girlfriend. . . . Finally, citing *Georgia* v. *Randolph*, 547 U.S. 103, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006), the court concluded that the police were not obligated to ask the defendant for his consent prior to entering the apartment even though he was nearby.

"On November 5, 2008, after a jury trial, the defendant was found guilty on all counts. On January 9, 2009, the court sentenced the defendant to a total effective term of forty years imprisonment and fifteen years of special parole." (Citation omitted; footnotes altered.) *State* v. *Buie*, supra, 129 Conn. App. 780–86.

The defendant appealed from the judgment of conviction to the Appellate Court, challenging the trial court's denial of his motion to suppress on the basis of Martin's apparent authority to consent to the entry of the police into his home. The defendant contended for the first time that, although the apparent authority doctrine is recognized as an exception to the warrant requirement under the federal constitution, the doctrine is inconsistent with article first, § 7, of the Connecticut constitution. Id., 780, 786. The Appellate Court determined that the defendant's unpreserved constitutional claim could be reviewed under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), but that it failed on the merits. *State* v. *Buie*, supra, 129 Conn. App. 787.

In reaching that conclusion, the Appellate Court examined each of the six factors that this court identified in *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), to be considered in determining whether our state constitution confers more expansive protection than the federal constitution: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies. *State* v. *Buie*, supra, 129 Conn. App. 788–806. It determined that none of these factors weighed in favor of the defendant's claim. Id. Ultimately, the Appellate Court held: "[A] warrantless entry by the police pursuant to the apparent authority doctrine is valid only when it is based on the consent of a third party who the police, at the time of the entry, reasonably believe possesses common authority over the premises, but, in reality, does not. The reasonableness of the belief must be measured by an objective standard. . . . Additionally, this conclusion must be made after an appropriate inquiry given the factual circumstances facing the police as to the third party's common authority over the premises.[3] Each case, of course, must be judged in light of its own facts and circumstances." (Citation omitted; footnotes altered.) Id., 806.

In his certified appeal to this court, the defendant claims that only actual legal authority to consent satisfies the requirement under article first, § 7, of the Connecticut constitution that "[t]he people shall be secure in their . . . houses . . . from unreasonable searches . . . ." Our examination of the record and briefs and our consideration of the arguments of the parties persuade us that the judgment of the Appellate Court should be affirmed. The Appellate Court's thorough and well reasoned decision properly resolved the certified issue. We conclude that it would serve no useful purpose for us to restate the basis of that court's decision. Accordingly, we adopt the Appellate Court's opinion as a proper statement of the applicable law on this issue, but note one minor clarification.

Specifically, in considering authority from other state courts, the Appellate Court stated: "Courts in Hawaii, Montana and Washington have rejected the apparent authority doctrine, relying on provisions within their respective state constitutions which provide their citizens with a right to privacy against invasion by the state. . . . These cases are distinguishable because the constitution of Connecticut, including article first, § 7, does not provide for a broad right of privacy but rather protects against unreasonable searches." (Citations omitted; footnote omitted.) *State* v. *Buie*, supra, 129 Conn. App. 801. We construe the latter comment simply as referring to the lack of an express textual reference to privacy in our constitution that might provide an independent substantive right warranting heightened protection. We do not construe the Appellate Court's statement to express a broader proposition as to whether our constitution implicitly protects privacy rights through other express provisions. Indeed, our cases have made clear that certain privacy rights are protected under both the state and federal constitution. See *State* v. *Davis*, 283 Conn. 280, 320, 929 A.2d 278 (2007) (We noted that, under article first, § 7, "this court has been willing to recognize a broader right to privacy under the state constitution. See, e.g., *State* v. *Miller*, [227 Conn. 363, 377, 630 A.2d 1315 (1993) (article first, § 7, requires police to obtain warrant to search impounded automobile)]; *State* v. *Geisler*, supra, 222 Conn. 691–92 [(emergency exception to warrant requirement is narrower under article first, § 7, than under federal constitution)]; *State* v. *Marsala*, [216 Conn. 150, 171, 579 A.2d 58 (1990) (good faith exception to warrant requirement does not exist under article first, § 7, of state constitution)]; *State* v. *Dukes*, [209 Conn. 98, 120–21, 547 A.2d 10 (1988) (search incident to arrest exception to warrant requirement is narrower under article first, § 7, than under federal constitution)]."); *In re Michaela Lee R.*, 253 Conn. 570, 598–99, 756 A.2d 214 (2000) ("While there is no right of privacy found in any specific guarantee of the [federal] [c]onstitution, the [United States Supreme] Court has recog-

nized that zones of privacy may be created by more specific constitutional guarantees and thereby impose limits upon government power. . . . [T]he [court] has recognized a right to privacy in the penumbra of the Bill of Rights, specifically in the protections of the first, third, fourth and fifth amendments." [Citation omitted; internal quotation marks omitted.]).

The judgment of the Appellate Court is affirmed.

* This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Rogers and Justices Palmer, Zarella, McDonald, Espinosa, Robinson and Vertefeuille. Although Justice Palmer was not present when the case was argued before the court, he has read the record and briefs and listened to a recording of the oral argument prior to participating in this decision.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victim or others through whom the victim's identify may be ascertained. See General Statutes § 54-86e.

[2] LB identified Martin as the second assailant based on recognizing Martin's voice when she said something to LB during the assault. Martin was arrested in connection with this incident and later entered a plea of nolo contendere to one count of aggravated sexual assault in the first degree.

[3] The Appellate Court also referred to the obligation of the police to conduct a "diligent inquiry"; *State* v. *Buie*, supra, 129 Conn. App. 805; a standard also adopted by our sister state of Massachusetts under its constitution. See *Commonwealth* v. *Porter P.*, 456 Mass. 254, 271, 923 N.E.2d 36 (2010) ("[w]hile we conclude that a search of a home does not violate [article fourteen of the Massachusetts Declaration of Rights] if the police officer has the voluntary consent of an individual with the apparent authority to give such consent, we do so only if the reasonable mistake of fact occurs despite diligent inquiry by the police as to the consenting individual's common authority over the home").